**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON**

**DENNIS CRAIG BOWLES,**

       **Plaintiff,**

**v.**                                                        **CASE NO. 2:10-cv-00845**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

       **Defendant.**

**M E M O R A N D U M   O P I N I O N**

    This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. Both parties have consented in writing to a decision by the United States Magistrate Judge.

    Plaintiff, Dennis Craig Bowles (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on February 13, 2006, alleging disability as of November 15, 2003, due to heart attack, high blood pressure, cholesterol, sleep apnea, sinus problems, and depression. (Tr. at 9, 101-06, 107-10, 118-27, 163-72, 173-77.) The claims were denied initially and upon reconsideration. (Tr. at 9, 58-62, 63-67, 77-79, 80-82.) On February 21, 2007, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 84.) The hearing was

held on April 25, 2008 before the Honorable James S. Quinlivan. (Tr. at 20-53, 92.)  By decision dated June 10, 2008, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 9-19.)  The ALJ's decision became the final decision of the Commissioner on April 21, 2010, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On June 18, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe

impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in

3

substantial gainful activity since the alleged onset date.  (Tr. at 11.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of obesity with shortness of breath/sleep apnea, degenerative pathology of the cervical and lumbar spine, hypertensive cardiovascular disease, bilateral varicose veins, elevated cholesterol and chest pains (angina). (Tr. at 11-13.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 13-14.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 14-16.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 16.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as light non-clerical office helper, light product inspector, light package worker, sedentary surveillance monitor, sedentary product inspector, and sedentary product inspector, which exist in significant numbers in the national economy.  (Tr. at 17-18.)  On this basis, benefits were denied.  (Tr. at 18-19.)

<u>Scope of Review</u>

     The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept
> as   sufficient   to   support   a   particular

4

> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 43 years old at the time of the administrative hearing on April 25, 2008. (Tr. at 23-24.) He was five feet, eight inches tall and weighed 265 pounds. (Tr. at 24.) He is a high school graduate with vocational training in automobile body work, automobile mechanics and building construction. Id. In the past, he worked as a tire changer and lube man at Wal-Mart, an automobile mechanic and pump attendant at a gasoline station, a discount store receiving worker, an automobile body repair worker, and he briefly owned his own automobile body repair shop. (Tr. at

45-47.)  When he last worked in 2003, he weighed 210.  (Tr. 25.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below:

Records indicate Claimant was treated approximately 26 times at Tristate Medical Center, West Hamlin Office, from January 5, 2003 to March 6, 2008 for a variety of ailments, including hypertension, cholesterol, allergies/sinusitis, sleep apnea, depression/anxiety, pain in chest/right upper quadrant, neck, back, hip, leg, and hand.  (Tr. at 213-17, 453-577.)

Records show Claimant was treated at Tri State Otolaryngology, Inc. on eleven occasions from January 23, 2004 to June 30, 2005 for nasal obstruction and sleep apnea.  (Tr. at 240-47.) Mark F. Sheridan, M.D. indicated that on October 29, 2004, Claimant underwent recommended "sinus surgery, nasal surgery...[at] St. Mary's Hospital." (Tr. at 242, 329-343.)  On November 23, 2004, Dr. Sheridan wrote: "Patient follows up on sinus and nasal surgery...He was encouraged to quit smoking and to follow up in a month...I would recommend that he just continue evaluation for CPAP [Continuous Positive Airway Pressure] therapy if they are worried about sleep apnea, which, per the patient, they apparently are." (Tr. at 241.) On June 30, 2005, Dr. Sheridan wrote: "He is having a little bit of trouble on the right side, but overall is generally pleased.  He has gotten a CPAP machine and is sleeping better...My

6

opinion is chronic rhinitis, stable." (Tr. at 240.)

Records indicate Claimant was treated at Lincoln Primary Care Center on eight occasions between August 12, 2004 and November 11, 2005 for high cholesterol, high blood pressure, and sleep apnea. (Tr. at 218-28, 250-63.) The final entry states "? Back pain radiating through to chest. Recommended Ibuprofen." (Tr. at 221, 250.)

Largely illegible handwritten medical record from St. Mary's Medical Center are included in the record. The records are dated March 10, 2005, March 24, 2005, April 21, 2005, May 9, 2005, May 13, 2005, May 18, 2005, June 2, 2005, December 1, 2005, January 5,2006, and February 23, 2006. (Tr. at 408-09, 418-38.) The legible words indicate Claimant sought treatment for chest pain and heartburn. (Tr. at 438.)

On March 9, 2005, Imran T. Khawaja, M.D. examined Claimant for possible obstructive sleep apnea. (Tr. at 397-98.) Dr. Khawaja stated: "Patient is being instructed not to drive since he will be hazardous not only to himself but to the others on the road until his sleep apnea is corrected. Patient is being advised to lose weight. Patient is also being strong advised to stop smoking." (Tr. at 398.)

On March 12, 2005, Claimant had an overnight polysomnographic study at Cabell Huntington Hospital. (Tr. at 231-36, 394-96.) Dr. Khawaja diagnosed Claimant with "[v]ery severe obstructive sleep

apnea with successful CPAP titration at 12 cm [centimeter] of water pressure...Weight loss close to ideal body weight is being strongly recommended....The patient may be advised to refrain from smoking, alcohol, sedatives...especially prior to going to bed time." (Tr. at 232-33, 293-94, 395-96.)

On March 16, 2005, Claimant had a "Stress Test Cardio" at St. Mary's Medical Center. (Tr. at 688-89.) Ellen Thompson, M.D. reviewed the testing and concluded: "1. Negative ECG stress test at 10 METS [metabolic equivalents]. 2. No chest pain. 3. Occasional PVCs [premature ventricular contractions] on stress. 4. Borderline functional capacity...Normal stress cardiolite." Id.

On June 6, 2005, Shadi Badin, M.D. and Imran T. Khawaja, M.D., University Physicians Internal Medicine, reported:

> The patient is a 40 year old white male who was seen in our clinic for evaluation of excessive daytime sleepiness. He had sleep study, which showed severe sleep apnea with apnea-hypopnea index of 90/hour, and this was found on the split-night sleep study that was done for the patient. He was then started on CPAP titration, which was successful, and the patient was started on CPAP. The patient is doing much better since then. He says that he does not have the troubles with the excessive daytime sleepiness or fatigue, and he feels like a different person. He denies any problems with the machine at this time. No complaints of his sinuses...We will see him in six months from now. He was strongly advised to lose weight.

(Tr. at 393.)

On February 1, 2006, Rodger Blake, M.D., St. Mary's Medical Center, interpreted an x-ray of Claimant's chest following complaints of chest pain. (Tr. at 417, 682-86.) Dr. Blake stated:

8

"A portable examination of the chest shows the heart and lungs to be within normal limits.  Conclusion: Normal AP chest."  <u>Id</u>.

On February 23, 2006, March 16, 2006, August 23, 2006, December 20, 2006, and February 21, 2007, Claimant was treated at University Cardiovascular Services following a left heart catheterization and stent placement on February 3, 2006 at St. Mary's Medical Center.  (Tr. at 280-92, 324-34, 391-92, 410-16, 539-41.)  Following the surgery, Elie Gharib, M.D. wrote: "Coronary artery disease...with diffuse ectatic changes in all of his vessels...Overall LV [left ventricle] function appears to be preserved although this was a suboptimal angiogram...Successful PTCA [Percutaneous Transluminal Coronary Angioplasty] and stent...Recommendation: Medical management and risk factor modification.  Plavix and Aspirin indefinitely."  (Tr. at 291.)

On February 27, 2006, Paul D. Akers, M.D., St. Mary's Medical Center, interpreted an "Acute Abdomen Complete" of Claimant's chest area due to Claimant's complaints of abdominal pain.  (Tr. at 405.)  Dr. Akers concluded that it "shows the heart and lungs to be within normal limits.  Flat and upright studies of the abdomen show no evidence of free peritoneal air.  The abdominal gas pattern is unremarkable.  No opaque calculi or abnormal soft tissue masses are present.  The bony structures appear normal."  <u>Id</u>.

On February 27, 2006, Claimant was treated at St. Mary's Medical Center Emergency Department for a rash. (Tr. at 400-06.)

John Morgan, M.D. diagnosed Claimant with "1. Contact dermatitis. 2. Constipation. 3. Noncompliance with medications." (Tr. at 402, 404, 679.)

On March 16, 2006, Tina M. Sias, M.D. noted: "IMPRESSION: 1. Unstable angina. 2. Recent myocardial infarction, known coronary artery disease. 3. Hyperlipidemia with LDL [low density lipoprotein] of 137... 4. He continues to smoke...EKG [electrocardiogram] checked today was normal." (Tr. at 282.) On August 23, 2006, Muhammad Taimoor Gill, M.D. noted that Claimant's hyperlipidemia was uncontrolled, that Lipitor would be tried, and that Claimant was counseled regarding smoking cessation. (Tr. at 280.)

On March 27, 2006, Roger C. Baisas, M.D. evaluated Claimant and provided a Social Security Disability Evaluation Report. (Tr. at 304-11.) Dr. Baisas noted that Claimant

admitted to smoking, "a pack a day"...

Our claimant on February 12, 2006, had an episode of heart attack for which he subsequently underwent coronary artery stent placement, "in two arteries." He has had some improvement from his chest pain, "but I still do have some chest pain and I am also short of breath just moving around, like walking, I also have my sleep apnea, although I don't sleep that much."

Our Claimant's daily living activities consist of, "I stay at home most of the time, watch television, my wife works and she cooks the meals and takes care of me, I can't even ride a lawnmower." ...

He did not bring with him any diagnostic studies for review.

(Tr. at 306, 309.)

On August 14, 2006, Claimant underwent ventilatory function testing.  (Tr. at 276-78.)  Dr. Nutter (no first name available) marks "no" on a form indicating there is no evidence of bronchospasm or acute respiratory illness and states "normal" in the section labeled "Interpretation."  (Tr. at 276.)

On August 24, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work (exertional limitations, occasionally lift and/or carry 20 pounds; sit/walk/stand about 6 hours in an 8-hour workday, unlimited push and/or pull) with all postural limitations marked as "occasionally" and no manipulative, visual, or communicative limitations.  (Tr. at 296-300.) Claimant's environmental limitations were found to be unlimited save to avoid concentrated exposure to extreme temperatures, humidity, hazards, and fumes, odors, dusts, gases, poor ventilation, etc.  (Tr. at 300.)  The evaluator, Earl Langley, noted Claimant's primary diagnosis as status post myocardial infarction and the secondary diagnosis as sleep apnea.  (Tr. at 296.)  He further noted that Claimant's recent pulmonary function study was normal.  (Tr. at 303.)

On August 30, 2006, an unsigned "Case Analysis" states: "On the 4734 dated 8/24/06 the RFC [Residual Functional Capacity] on page 2 A2 "10 pounds" should be checked.  Regarding credibility the

11

claimant is considered not fully credible as her [sic] complaints of fatigue and shortness of breath are not consistent with the clinical findings." (Tr. at 312.)

On February 12, 2007, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work (exertional limitations, occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit/walk/stand about 6 hours in an 8-hour workday, unlimited push and/or pull) with all postural limitations marked as "occasionally" and no manipulative, visual, or communicative limitations. (Tr. at 345-52.) Claimant's environmental limitations were found to be unlimited save to avoid concentrated exposure to extreme temperatures, vibration, hazards, and fumes, odors, dusts, gases, poor ventilation, etc. (Tr. at 349.) The evaluator, A. Rafael Gomez, M.D. stated Claimant's primary diagnosis as status post acute myocardial infarction and the secondary diagnosis as sleep apnea. (Tr. at 345.) He noted: "Patient was reviewed on 08/24/06 and reduced to light work. New medical evidence which is dated prior to the date of initial review did not change RFC." (Tr. at 350.)

On February 14, 2007, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant's impairment was not severe. (Tr. at 354-67.) The evaluator, John Todd, Ph.D., licensed psychologist, found that Claimant's affective

disorder, depression, caused a mild degree of limitation in restriction of activities of daily living, no limitations regarding social functioning, concentration, persistence or pace, and no episodes of decompensation. (Tr. at 357, 364.)   He found the evidence did not establish the presence of the "C" criteria.   (Tr. at 365.)   Dr. Todd concluded:

> CLMT [claimant] is mostly credible, he has no psych [psychiatric] HX [history] of IP/OP [inpatient/outpatient] TX ["treatment"] though RX'ed [prescribed] antidepressant on 6/06, clmt alleges no problems w/ [with] mental functioning, and TS [treating source] notes no problems with MS [mental status].   He performs personal care, walks for exercise, drives, shops, manages finances, plays cards and states handling stress well, though somewhat restricted by c/o physical. Preponderance of evidence indicates that limitations due to a mental D/O are considered NON-SEVERE.

(Tr. at 366.)

On March 27, 2007, Rob Crowder, Physical Therapist, wrote a letter to Gazala Darvesh, M.D. stating that he had evaluated Claimant upon his referral.   (Tr. at 441.)   Mr. Crowder stated: "Assessment: Significant loss of functional ROM [range of motion] in the cervical and lumbar spine.   Plan: We did begin with light flexibility program.   We will progress with this program as tolerated."   Id.

On May 3, 2007, Ijaz Ahmad, M.D., St. Mary's Medical Center, wrote a "Report of Electromyography" stating that Claimant's testing showed

> 1.   Moderate prolongation of distal sensory and motor latency of the left median nerve consistent with

13

        carpal tunnel syndrome.
2.    Mild chronic denervation in the left deltoid of uncertain significance.
3.    Normal conduction velocities and EMG examination of the right upper and both lower extremities.  There was no definite evidence of radiculopathy.

(Tr. at 389.)

On May 8, 2007, David A. Denning, M.D. wrote to Dr. Darvesh thanking him for referring Claimant to him for evaluation of his varicose veins.  (Tr. at 442.)  Dr. Denning reported:

> **ASSESSMENT & PLAN:** I obtained some arterial Doppler studies from St. Mary's Medical Center.  They had an ankle/brachial index of greater than 1.0 bilaterally.  I told him I do not think surgery was indicated for this.  He may be a candidate for endovascular laser ablation although he has not tried conservative treatment at all.  I wrote him a prescription for knee-high support stockings, 30mm-40mmHg to get and use for at least six months.  If he has not gotten relief by then, he is to contact me again.

(Tr. at 443.)

On May 23, 2007, Joseph Dransfeld, M.D., Tri-State MRI, reported that Claimant had a MRI of the cervical spine without contrast:  "Vertebral height, alignment and marrow signal is normal.  Cervical spinal cord is normal.  Cerebellar tonsils are in normal position.  No cervical disc herniation.  No neural foraminal stenosis.  IMPRESSION: Negative exam.  Specifically no HNP [Herniated Nucleus Pulposus]."  (Tr. at 450.)

On May 23, 2007, Dr. Dransfeld also reported that Claimant had a MRI lumbar spine without contrast:

> Vertebral height, alignment and marrow signal are normal.  There is desiccation at the L3-4 intervertebral disc with

14

bulge of the annulus.  At L4-5, there is degenerative
bulging disc slightly asymmetric to the right.  There is
no neural compression seen although there is narrowing of
the inferior right intervertebral foramen as a result.
No fracture or other finding.

IMPRESSION: L3-4 and L4-5 degenerative bulging discs.

(Tr. at 451.)

On June 5, 2007, Imran T. Khawaja, M.D. reported that
Claimant underwent a BiPap Study at Cabell Huntington Hospital,
Sleep Disorders Center.  (Tr. at 444-45.)  Dr. Khawaja stated:

**DIAGNOSIS:**
Very severe sleep apnea/complex sleep apnea syndrome with
successful BiPap titration (780.53).

**RECOMMENDATIONS:**
1.    Based on the current study, the patient may be
      switched from CPAP to BiPap using settings of iPAP
      of 14 and an EPAP of 10 using a comfort gel nasal
      mask.
2.    Weight loss close to ideal body weight is strongly
      being recommended.
3.    The patient may be advised to refrain from smoking,
      alcohol, sedatives or any other CNS suppressant
      medications especially prior to going to bedtime.

(Tr. at 445.)

On August 30, 2007, Rida Mazagri, M.D. evaluated Claimant upon
referral by Dr. Darvesh.   Dr. Mazagri described Claimant as being
"in mild distress."  (Tr. at 447.)  Dr. Mazagri stated:

Impression: This is a 42 year old gentleman with back
pain and right leg pain and numbness most probably
related to his degenerative disc disease at multiple
levels especially as seen on the MRI at L/3-4 and L/4-5.

Plan:
1.    I discussed with the patient the different etiology
      of his symptomatology...
2.    The patient was started on a short course of

15

> steroid...
>
> 3.    The patient was encouraged to have physiotherapy treatment to further condition his abdominal and back musculature and to be involved in a weight reduction program where he needs to lose 40-50 pounds.
>
> 4.    He was given a prescription of Lortab.
>
> 5.    He will be reassessed in a few weeks for further evaluation. If his symptomatology continues a pain management clinic with possible nerve blocks may be beneficial.

(Tr. at 448.)

On November 1, 2007, David L. Caraway, M.D., Ph.D., Center for Pain Relief, St. Mary's Medical Center, examined Claimant at the request of Gregory D. Chaney, M.D. (Tr. at 537-38.) Dr. Caraway stated:

> As you know he is a 43-year-old Caucasian male whose MRI shows L3-L4, L4-L5 degenerative bulging discs. He also has narrowing of the inferior right intervertebral foramen, which is consistent with his pain complaints. He takes Lortab 7.5/500 mg one to two times a day as needed. He is also on Plavix for a heart condition...
>
> The cervical spine is normal, upper extremities range of motion is full, grip strength is 5/5, there is no scoliosis or kyphosis noted on inspection of the thoracolumbar spine. He has a positive straight leg raise on the right at 90 degrees, negative on the left. Range of motion of the lumbar spine revealed flexion 60, extension 20, rotation 50 degrees bilaterally. Neurological exam revealed DTRs [deep tendon reflexes] 2+ and equal bilaterally, no clonus or spasticity. Sensory exam is intact. Heel to toe walk as well as gait are normal, there is no edema, cyanosis, or clubbing of the lower extremities.
>
> This is a patient with degenerative disc disease with right-sided radiculopathy that is consistent with his MRI. We will go ahead and set this patient up for a series of right-sided transforaminal lumbar epidural steroid injections if the patient can come off his Plavix for one week prior to each injection.

16

Id.

Records indicate Claimant had follow-up examinations with Dr. Caraway on November 29, 2007, December 21, 2007, January 18, 2008, and March 17, 2008 for transforaminal epidural steroid injections. (Tr. at 582-21.)

On February 7, 2008, Dr. Chaney completed a form titled "West Virginia Department of Health and Human Resources Medical Review Team (MRT) General Physical (Adults)." (Tr. at 529-31.) Dr. Chaney opined that Claimant's "severe chronic back, hip, leg...hand...chest pain" caused him to be "unable to walk stand > 15, unable to sit > 30 minutes." (Tr. at 530.)

On February 28, 2008, Dr. Chaney, responded to a three-question letter from Claimant's representative. (Tr. at 368-69.) The handwritten response to the first question - "Do you feel that Mr. Bowles' subjective complaints of pain and fatigue are consistent with your objective findings? If so, on what do you base this opinion?" - states: "Yes. Pt [patient] show significant tenderness of c-spine & l-spine." The handwritten response to the second question - "Do you think that Mr. Bowles could engage in employment (8 hours a day, 5 days a week) on a consistent basis? If not, why?" - states: "No. Pt has significant pain and can not lift, stand, walk or sit consistently enough to be employed. Pt also has significant Anx [anxiety]/Depression." (Tr. at 368.) The handwritten response to the third question - "Does Mr. Bowles have

17

other impairments which limit his ability to work?  If so, what?" -
states: "Pt has Anxiety/Depression w/ [with] difficulty w/ work
stressors & staying on task."  (Tr. at 369.)

On March 6, 2008, Dr. Chaney completed a form titled "Medical
Assessment of Ability to do Work-related Activities (Physical)."
(Tr. at 370-72.)  He stated that Claimant could lift/carry a
maximum of 10 pounds occasionally and five pounds frequently, could
stand/walk two hours in an 8-hour workday, and sit for four hours
in an 8-hour workday.  (Tr. at 370-71.)  He marked that Claimant
could "never" do any postural activities.  (Tr. at 371.) He marked
that the only physical functions not affected by the impairment
were "hearing" and "speaking" and that the only environment
restriction Claimant did not have was "noise."  (Tr. at 372.)

On April 12, 2008, Paul W. Craig, II, M.D. examined Claimant
and reviewed his medical records at the request of Claimant's
representative.  (Tr. at 694-97.)  Dr. Craig concluded:

> After a complete review of the records presented, as well
> as the completion of a physical evaluation, the
> claimant's limitations are delineated below and in the
> attached form(s).
>
> 1.  Significant coronary artery disease with evidence
>     of prior, mild heart attack as well as placement of
>     two cardiac stents.
> 2.  Ongoing angina by history controlled with
>     medications.
> 3.  Hypercholesterolemia controlled with medications.
> 4.  Moderate to severe excess weight with secondary
>     sleep apnea treated with BI-PAP.
> 5.  Hypertension controlled with medication.
> 6.  Chronic LBP [low back pain] with right sided
>     sciatica due to underlying degenerative disease.

18

7.  Moderate to severe venous stasis and varicose veins
    noted on examination.
8.  History related of depression and anxiety treated
    with medication.
9.  Mild COPD [chronic obstructive pulmonary disease].
10. Combined effect of multiple medical problems
    requiring multiple medications for control with a
    marked limitation of endurance and physical
    capacity resulting in his being limited to
    sedentary to very light physical capacity category.
    Furthermore, it remains highly unlikely that he
    would be able to reasonably work 8 hours a day 5
    days per week.

(Tr. at 694.)

On April 12, 2008, Dr. Craig also completed a form titled
"Medical Assessment of Ability to do Work-related Activities
(Physical)."  (Tr. at 695-97.)  He checked "Yes" indicating
Claimant's lifting/carrying, standing/walking, and sitting were
affected by impairments.  (Tr. at 695-96.) He stated that Claimant
was limited to lifting/carrying 10-15 pounds, 10 or more maximum
occasionally, 6 pounds maximum frequently; could stand/walk for 2-4
hours in an 8-hour workday, without interruption for 1-2 hours; and
could sit 4-6 hours in an 8-hour workday, 2-4 hours without
interruption.  Id.  He opined that Claimant could never do the
postural activities, noting "rare" with "balance."  (Tr. at 696.)
Regarding physical functions, he found Claimant was not limited in
reaching, seeing, hearing, or speaking but was limited in handling,
feeling, pushing/pulling.  (Tr. at 697.) He concluded Claimant
should have all the environmental restrictions, with the exception
of not having a noise restriction.  Id.

19

Medical Records Provided to the Appeals Counsel

On January 21, 2010, Claimant was hospitalized at St. Mary's Medical Center for chest pain and a history of unstable angina. (Tr. at 699-709.) On that date, Rameez Sayyed, M.D. performed a "[l]eft heart catheterization, selective coronary angiography, left ventriculopgraphy, femoral angiography, percutaneous coronary intervention to the left circumflex artery." (Tr. at 707.) Dr. Sayyed concluded:

1. 90% tubular lesion in the proximal to mid circumflex artery.
2. Ectatic changes involving the proximal to mid segment of the LAD, about 30% luminal irregularities.
3. Ectatic changes, about 30% luminal irregularities in the RCA with 40% eccentric lesion in the distal RCA before the bifurcation into PDA and posterolateral branch.
4. Normal LV [left ventricular] functions.
5. Normal hemodynamics.
6. Successful percutaneous coronary intervention to the culprit left circumflex artery which is a large caliber vessel with direct stenting of a 20mm lesion with a 4.5/24mm VeriFlex stent deployed at 16 atmospheres. However, slow flow was noted after the deployment of the stent with no obvious clot, dissection or perforation. The slow flow was treated with Adenosine, Nipride and Nitroglycerin. Afterwards there was TIMI-III flow with no evidence of side branch occlusion, perforation or dissection.

Recommendation:
1. Integrilin drip for 12 hours with close monitoring of the CBC in 4 hours and after the drip is stopped.
2. Aspirin for life and Plavix for at least one year.
3. Medical management of coronary artery disease.
4. FemoStop should be applied for 5-6 hours after the sheath is removed.

(Tr. at 708.)


New Physical Evidence provided with Claimant's Brief

     On January 25, 2010, a "Discharge Summary" from St. Mary's
Medical Center indicates that Claimant "was discharged to home" and
"given special instructions to call Dr. Chaney's office for a
followup appointment the next week...also instructed to followup
with Marshall University Cardiology in four to six weeks on March
16, 2010."  (CM/ECF No. 13-2 at 1.)  Carol L. Patterson, M.D.
stated:

     PROCEDURES

     1.   Left heart catheterization.
     2.   Computerized tomography of the abdomen revealing
          negative findings.
     3.   Computerized tomography of the pelvis with negative
          findings.
     4.   Two-dimensional echocardiography revealing mild
          mitral regurgitation.  Ejection fraction of 55% to
          60%.
     5.   Ultrasound of the abdomen revealing no evidence of
          cholelithiasis.
     6.   Percutaneous coronary intervention to the left
          circumflex with stent placement.

     DISCHARGE DIAGNOSES

     1.   Non-ST-elevation myocardial infarction.
     2.   Coronary artery disease.
     3.   Jaundice.
     4.   Abdominal pain.
     5.   Hypertension.
     6.   Hyperlipidemia.
     7.   Obstructive sleep apnea.
     8.   Gastroesophageal reflux disease.
     9.   Obesity.
     10.  Tobacco abuse.

BRIEF HOSPITALIZATION STAY AND SUMMARY
The patient is a 45-year-old male with a past medical history of coronary artery disease and non-ST-elevation myocardial infarction who presented to the emergency room with retrosternal chest pain for the previous five days. It was lasting for a couple of minutes as a time that had started in his back and radiated to his chest and to his left shoulder. There was no nausea or vomiting. He did have dyspnea and dizziness but no diaphoresis. The pain was not similar to the pain he had had previously when he had a myocardial infarction. He had been to the emergency room once and refused admission. However after the pain resumed, he came in for a complete work up and definitive treatment. Marshall University cardiology saw the patient. He went to the catheterization laboratory and had a left heart catheterization with a stent placed into his circumflex artery. The patient tolerated this well. Appropriate arrangements for discharge followup were made.

(CM/ECF No. 13-2 at 2-3.)

On April 8, 2010, Gregory Chaney, M.D. completed the "Physician's Certification" section of a form titled "West Virginia Division of Motor Vehicles Parking Application for Mobility Impaired Person." (CM/ECF No. 13-1.) The form is marked "Permanent - Valid 1-5 years" and "Are severely limited in their ability to walk due to arthritic, neurological, or orthopedic condition." Id.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ did not properly evaluate the medical evidence of record, give appropriate weight to the opinions of the treating physicians, and dutifully develop the record regarding Claimant's mental impairment, (2) the

22

ALJ erred in finding not Claimant to be fully credibility, (3) new, material, and additional evidence exists to justify reversal and/or remand. (Pl.'s Br. at 3-11.)

The Commissioner responds that substantial evidence supports the Commissioner's Final Decision that Claimant was not disabled on or before June 10, 2008 (date of ALJ's final decision) because (1) the ALJ properly evaluated the medical evidence of record, (2) Claimant's allegations of disability are not fully credible, and (3) Claimant's additional evidence does not warrant remand. (Def.'s Br. at 10-15.)

<u>Medical Source Opinions</u> and <u>Duty to Develop Record</u>

Claimant argues that the ALJ did not properly evaluate the medical evidence of record (including Claimant's mental health status, wherein he allegedly failed in his duty to develop the record) and give appropriate weight to the opinions of the treating medical sources, Drs. Chaney and Craig. (Pl.'s Br. at 7-10.) Specifically, Claimant asserts:

> It is inescapable that the ALJ erred when he failed to articulate in a meaningful manner why he disregarded the opinion of Gregory Chaney, M.D., the Plaintiff's treating physician, that the Plaintiff cannot engage in employment (8 hours a day, 5 days a week) on a consistent basis (Tr. 368-372). Obviously, the ALJ has refused to follow the well-accepted "Attending Physician Rule" which was adopted by the Fourth Circuit in Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).
>
> Likewise, the ALJ erred when he failed to articulate in a meaningful manner why he disregarded the opinion of Paul W. Craig II, M.D., a consultative examining physician, who stated that it is highly unlikely that the

23

Plaintiff "...would be able to reasonably work 8 hours a day 5 days a week" (Tr. 694-697). It is disingenuous for the ALJ to ignore the opinion of a specialist in occupational medicine, board certified by the American Board of Preventative Medicine (Occupational), and a Certified Independent Medical Examiner with nearly 4,000 IME's performed (Tr. 207-209). Obviously, Dr. Craig's opinion should be afforded great weight and the ALJ should not have been allowed to substitute his own medical opinion. Such action by the ALJ exceeds the parameters of his authority and expertise. It is ludicrous for the ALJ to state that Dr. Craig's assessment is not supported by specific clinical signs or findings (Tr. 16) when Dr. Craig reviewed the Plaintiff's records and personally examined the Plaintiff (Tr. 694).

In a similar vein, the ALJ erred when he stated that the Plaintiff's depression is not severe. For some reason, the ALJ stated that Gregory Chaney, M.D., the Plaintiff's treating physician, relied on "...psychological factors which are beyond his field of expertise" (Tr. 16). If the ALJ questioned the validity of Dr. Chaney's opinion regarding the Plaintiff's anxiety and depression, he should have ordered additional development regarding the Plaintiff's anxiety and depression, then he should have ordered additional development regarding the Plaintiff's mental impairments. Unfortunately, the ALJ failed to scrupulously and conscientiously probe into, inquire of, and explore all relevant facts....It is obvious that the ALJ neglected his duty to properly develop the record.

The ALJ has forgotten that SSA Regulations provide that the SSA will "...always give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion" and list factors an ALJ must consider to assess the weight to be given to the opinion of a treating physician when the ALJ determines that it is not entitled to "controlling weight."...

In the case at hand, a review of the hearing decision reflects a total lack of analysis of the opinions of several treating sources by the ALJ. This failure to evaluate these treating source opinions constitutes grounds for reversal and/or remand.

(Pl.'s Br. at 7-10.)

The Commissioner responds that the ALJ properly evaluated the medical evidence of record. (Def.'s Br. at 11-12.)  Specifically, the Commissioner asserts:

> Plaintiff's reliance on the conclusory disability opinions of Drs. Chaney and Craig is faulty. First and foremost, only the opinions of a treating physician is entitled to controlling weight.  The treating source's opinion must also be well-explained by the evidence of record, and consistent with other evidence of record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Here none of these factors are present.  Although Dr. Chaney was a treating source, his conclusions were not well-explained by his treatment notes, and his opinions were inconsistent with the opinions of neurosurgeons Drs. Baisas and Mazagri. For example, Dr. Chaney in a medical assessment stated that Plaintiff had reduced range of motion in both his lumbar and cervical spines (Tr. 370).  His examinations, however, do not specify any degrees of reduction (Tr. 455, 463, 467, 469, 471, 473, 475).  Instead, neurosurgeon Dr. Mazagri concluded that, at most, Plaintiff had only a mild reduction in only the lumbar extension and flexion (Tr. 448).  Plaintiff's cervical MRI was negative (Tr. 450, 502).  His EMG was negative for radiculopathy in any extremity, and he showed only mild carpal tunnel (Tr. 389, 503, 666). Similarly, Dr. Craig, who examined Plaintiff once, did not offer any clinical examination findings to justify his opinion of disability (Tr. 694-97).

> As noted by the ALJ, there is no factual support in the record to corroborate a significant decline in Plaintiff's physical or mental functioning identified by Drs. Chaney and Craig (Tr. 16).  The explanations of both physicians lack specific clinical examinations findings, (Tr. 455, 463, 467, 469, 471, 473, 475, 577, 694), and are contradicted by the EMG and MRIs conclusions (Tr. 450-51, 503), as well as the clinical examinations and conclusions of the examining specialists (Tr. 305-08, 448-51, 538). The ALJ reasonably gave these opinions little weight as their conclusions are not consistent with the record as a whole nor with their evaluations (Tr. 16).

> Also, at issue is Plaintiff's contention that the ALJ improperly evaluated his mental health status (Pl.'s Br.

at 8). To the contrary, the ALJ was not persuaded by Plaintiff's limited complaints of depression and anxiety, and very limited treatment (Tr. 12-13). John Todd, Ph.D., the state agency psychological consultant, opined that Plaintiff's alleged mental impairment was non-severe, and that Plaintiff had no psychological history of inpatient or outpatient treatment (Tr. 366). Plaintiff confirmed at his hearing that he has never been treated for any nervous condition or undergone any counseling for nerves (Tr. 26). Despite requesting a prescription for a psychotropic medication, Plaintiff alleged no problems with mental functioning and the examining sources failed to note any problems with Plaintiff's mental status (Tr. 366, 448). Although Plaintiff alleged a worsening of his mental status at the April 2008 hearing, (Tr. 43), the preponderance of the evidence indicates that limitations due to a mental disorder are considered to be non-severe (Tr. 366). The ALJ provided a meaningful judicial basis for the denial of Plaintiff's mental health claim, and consequently, the ALJ in this case has not committed an error that warrants setting the Commissioner's final decision aside.

Id.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections

404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).  Sections 404.1527(d)(2)(i) and 416.927(d)(2)(i) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.  Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  See 20 C.F.R. § 404.1527(d)(2) (2005).  Thus, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924

F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2005).

Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.  Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

Under § 404.1527(d)(1), more weight generally is given to an examiner than to a non-examiner.  Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record."  Martin v. Secretary of Health, Education and Welfare, 492 F.2d 905, 908 (4th Cir. 1974); Hayes v. Gardener, 376 F.2d 517, 520-21 (4th Cir. 1967). Thus, the opinion "of a non-examining physician can be relied upon when it is consistent with the record."  Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986).

28

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)(2006).  Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational.  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence."  Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986).  The court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate."  Id.  The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence.  Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he or she is disabled.  20 C.F.R. §§ 404.1512(a)

and 416.912(a) (2010).  Thus, Claimant is responsible for providing

medical evidence to the Commissioner showing that he or she has an

impairment.  Id. §§ 404.1512(c) and 416.912(c).  In Bowen v.

Yuckert, the Supreme Court noted:

> The severity regulation does not change the
> settled allocation of burdens of proof in
> disability proceedings.  It is true . . . that
> the Secretary bears the burden of proof at
> step five . . . [b]ut the Secretary is
> required to bear this burden only if the
> sequential evaluation process proceeds to the
> fifth step.  The claimant first must bear the
> burden . . . of showing that . . . he has a
> medically severe impairment or combination of
> impairments . . . .  If the process ends at
> step two, the burden of proof never shifts to
> the Secretary.  . . .  It is not unreasonable
> to require the claimant, who is in a better
> position to provide information about his own
> medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

In an extensive eleven-page decision, the ALJ considered the

entire record and made these findings regarding Claimant's

impairments, including Claimant's mental health status:

> The claimant has the following severe impairments: obese
> with shortness of breath/sleep apnea, degenerative
> pathology of the cervical and lumbar spine, hypertensive
> cardiovascular disease, bilateral varicose veins,
> elevated cholesterol and chest pain (angina).  The
> claimant has not severe: depression and vision loss (new
> prescription for glasses)(20 CFR 404.1520(c) and
> 416.920(c)).
>
> The medical evidence indicates an April 2007 x-ray noted
> cervical degenerative changes and a January 2007
> pulmonary function study showing minimal obstruction
> (Exhibit 33F).  Records from the University
> Cardiovascular Associates from August 2006 indicate that
> the claimant used a CPAP successfully for severe sleep

apnea, the claimant had a successful stent emplacement but did have unstable angina which was later controlled. The claimant did have uncontrolled hyperlipidemia (Exhibit 9F).  The undersigned finds that the evidence shows the claimant has impairments which are severe and resolves this step in the claimant's favor.

The claimant's medically determinable mental impairments of depression, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe.   In making this finding, the undersigned considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

The undersigned finds that the claimant's symptoms, as shown by the evidence of record, would meet the "A" criteria of section 12. 04.   The claimant's mental conditions would not meet any of the listed impairment at 12.00 as shown by the following review of the "B" criteria.

The first area of the "B" criteria, "activities of daily living"...The claimant has not reported any restrictions in using the accout[re]ments of daily living such as telephones or directories.   The claimant watches television, can take care of his personal needs, his wife does the cooking and housecleaning, he does no yard work, he drives, shops occasionally, visits with friends and plays cards.  The undersigned finds that the claimant has no evidence of limitation in this area.

The second area of the "B" criteria, "social functioning"...The claimant reports he visits with friends and plays cards.  The state agency interviewer did not note any problems upon interviewing the claimant. The undersigned finds that the claimant has no evidence of limitation in this area.

The third "B" criteria, "concentration, persistence and pace"...The claimant does retain sufficient concentration for driving, playing cards and shopping.  The claimant has not reported a specific problem in this area.  The undersigned finds that the claimant has no evidence of

limitation in this area.

The last area of function evaluated in the "B" criteria
is "deterioration and decompensation in work and work-
like settings"...There is no evidence of record that the
claimant has ever experienced such episodes.
Accordingly, the degree of limitation in this area is
never...

Because the claimant's medically determinable mental
impairments cause no more than "mild" limitation in any
of the first three functional areas and "no" limitation
in the fourth area, they are non-severe (20 CFR
404.1520a(d)(1) and 416.920a(d)(1)).

(Tr. at 11-13.)

Regarding the opinions of the treating medical sources, Drs.

Chaney and Craig, the ALJ made these findings:

As for the opinion evidence, the state agency consultants
found that the claimant would be restricted to the light
exertional range (Exhibits 10F and 5F). Gregory Chaney,
MD found that the claimant was restricted to sedentary
exertion (Exhibit 19F). However, Dr. Chaney's notes
indicate that he relied partly on psychological factors
which are beyond his field of expertise. Also Dr. Chaney
emphasizes the claimant's back complaints but the
claimant has shown no signs of neurologic deficits. The
medical evidence is consistent with complaints which have
required conservative treatment only. The undersigned
does not find that these restrictions are not persuasive
(20 CRF 404.1527 and 416.927). Dr. Craig noted that the
claimant could lift 10-15 pounds which is more than
sedentary and less than light (Exhibit 35F). However,
Dr. Craig's assessment is not supported by specific
clinical signs or findings. The evidence overall shows
only conservative treatment for musculoskeletal
complaints, the claimant's heart condition has not shown
further symptoms and the claimant is not noted to have
any further unstable conditions. The undersigned does
not find that this assessment is persuasive (20 CRF
404.1527 and 416.927). The undersigned finds that the
claimant's back condition and carpal tunnel syndrome have
shown only limited signs and findings in the evidence and
the claimant's other complaints have been noted to be
stable under effective treatment. The undersigned finds

> in favor of the state agency assessment to light exertion
> but will assign additional restrictions for the
> claimant's specific complaints.

(Tr. at 16.)

With respect to Claimant's argument that the ALJ gave insufficient weight to Drs. Chaney and Craig's opinions and "failed to articulate in a meaningful manner why he disregarded their opinion" and "substituted his own medical opinion," the court finds that the ALJ properly considered the treating and consulting physicians' opinions in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence.  In order for a treating physician's opinion to be given controlling weight it must be supported by clinical and laboratory diagnostic techniques and not be inconsistent with other substantial evidence.  In the subject claim, Drs. Chaney and Craig failed to provide factual support and specific clinical examination findings to support their reported decline in Claimant's physical functioning.  The ALJ reasonably gave these opinions little weight as their conclusions are not consistent with the record as a whole nor with their evaluations (Tr. 16).

With respect to Claimant's argument that the ALJ failed in his duty to develop the record regarding Claimant's mental status and inappropriately found that Dr. Chaney's diagnosis of anxiety/depression to be beyond his field of expertise, which required the

ALJ to order additional development regarding the Plaintiff's mental impairments, the court finds ALJ properly considered the medical evidence of record, including the opinions of Dr. Chaney, in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence.  The state agency psychological consultant opined that Claimant's alleged mental impairment was non-severe, and that Claimant had no psychological history of inpatient or outpatient treatment. (Tr. at 366.)  Claimant confirmed at the April 25, 2008 hearing that he has never been treated for or received counseling for anxiety or depression. (Tr. at 26).  Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel.  Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994).  Claimant bears the burden of establishing a prima facie entitlement to benefits.  See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  Similarly, he or she "bears the risk of non-persuasion."  Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

Credibility

Claimant next argues that the ALJ erred when he failed to

properly consider Claimant's credibility.   (Pl.'s Br. at 5-7.)
Specifically, Claimant asserts:

> [i]t is the Plaintiff's assertion that his testimony is
> entitled to full credibility because his exertional and
> non-exertional impairments are disabling in nature.
> Obviously, the ALJ erred when he found the Plaintiff's
> credibility "...to be only fair" (Tr. 15).  It is the
> Plaintiff's position that because his allegations and the
> medical evidence of record are mutually supportive then
> the exacting requirements of the Social Security
> Disability Reform Act of 1984 are met.  This "mutually
> supportive test" was recognized in <u>Coffman v. Bowen</u>, 829
> F.2d 514 (4th Cir. 1987), and should be applied in the
> instant case to allow the Plaintiff the ability to
> satisfy the rigors of 42 U.S.C. §423(d)(5)(A)...
>
> In the case at hand, the assessment of the Plaintiff's
> credibility is of utmost importance in as much as the
> Vocational Expert testified that the Plaintiff cannot
> engage in substantial gainful activity if his testimony
> is given full credibility (Tr. 51)...
>
> Going further, the Plaintiff specifically relies on the
> decision of <u>Walker v. Bowen</u>, 889 F.2d 47 (4th Cir. 1989),
> which holds that while there must be some condition that
> can reasonably be expected to produce pain, there need
> not be objective evidence of the pain itself or its
> intensity.  In fact, the holding of <u>Hines v. Barnhart</u>,
> 453 F.3d 559 (4th Cir. 2006), would allow the Plaintiff
> to rely exclusively on subjective complaints of pain.
> Such is not the case in this matter in as much as
> substantial objective evidence of disabling pain exists
> to support the Plaintiff's allegations.  Unquestionably,
> the evidence exceeds the requirements of <u>Walker</u> and <u>Hines</u>
> and dictates a favorable finding for the Plaintiff.

<u>Id</u>.

The Commissioner responds that the ALJ properly evaluated
Claimant's credibility and subjective complaints.  (Def.'s Br. at
12-14.)  Specifically, the Commissioner asserts:

> Plaintiff's claim for disability is flawed because
> Plaintiff's credibility is "fair" (Tr. 15).  An example

35

of Plaintiff's lack of credibility is illustrated by the circumstances of his work stoppage, which are unclear and inconsistent (Tr. 15).   Another example of Plaintiff's diminished credibility is exposed by the successful treatment he experienced that restored his health and ability to work.   Plaintiff claimed that he was disabled due to shortness of breath and sleep apnea, but his breathing was much improved with sinus surgery; apnea was controlled with a CPAP or BiPAP machine; and his pulmonary function tests were repeatedly normal (Tr. 232, 240, 276-78, 339-43, 428, 445, 507-08).   Plaintiff's subjective complaints were not corroborated by the objective medical evidence of record.

Credibility is very important in disability cases due to the secondary motive of gaining benefits.   An ALJ is required to evaluate a claimant's credibility, and the ALJ's evaluation is entitled to great weight... Considering the many inconsistencies pointed out in the body of this brief and those in the ALJ's decision, the ALJ reasonably concluded that Plaintiff was not fully credible, as the objective medical evidence does not support Plaintiff's allegations (Tr. 15)...

It is undisputed that Plaintiff voluntarily stopped working unrelated to a physical or mental impairment, but rather because he moved to a different state (Tr. 29). Moreover, his allegations of disabling impairments are not fully credible or supported by the evidence of record.   Plaintiff's allegations of disability simply do not correspond with his treatment record.   The evidence reveals that Plaintiff's impairments did not preclude him from performing all work, rather Plaintiff could perform a range of light and sedentary work.   Therefore, substantial evidence supports the ALJ's finding that Plaintiff could perform work that exists in significant numbers in the national economy and is not disabled.

Id.

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional

36

effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.  The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

The ALJ wrote a very thorough evaluation of Claimant's

impairments and the medical evidence of record, including Claimant's daily activities. (Tr. at 18-30.) The ALJ made these specific findings regarding Claimant's credibility:

> The Claimant reports that he has varicose veins, feels out of breath, his muscles and joints ache and he has sleep apnea. He states he has aching pain, it is continuous, radiates to the hip, has headaches, arm and hand pain and numbness and has had a "heart attack." He indicates he has high cholesterol, high blood pressure, sinus problem and states he is tired all the time. He notes that eating, walking and exercise worsens his pain. He uses a CPAP device for apnea. The claimant indicates that he is taking Metoprolol, Lodrane, Acevacid, Lisinopril, Plavis, Bayer, Colace, Lolestipal, Lortab, Nitroglycerin, Fish Oil, Flaxseed Oil, Paxil, Nasonex, Colestid, Flonase, Advair, Zoloft, Toprol, Laocal, Rhinocort, Prinivil and Aspirin.

> The claimant has indicated that he can lift 5 pounds, walk 100 feet or 2 blocks, stand 30 minutes, sit 30-45 minutes and has difficulty reaching, squatting and sitting. He states that he watches television, can take care of his personal needs, his wife does the cooking and housecleaning, he does no yard work, he drives, shops occasionally, visits with friends and plays cards.

> I find the claimant's credibility to be only fair. The medical evidence indicates the claimant has complained of back pain but has no record of related hospital care other than MRI testings. He has had only conservative treatment for his back complaints without surgery. The claimant has not yet had surgery for his varicose veins. Likewise the claimant has not been noted to have undergone any surgery for his complaints of carpal tunnel syndrome, it is a recent complaint and lacks any clinical signs. Though the claimant had sought treatment for apnea near his onset date in recent years he has not. Since the claimant's sinus nasal septum surgery the claimant has not shown significant cardiac complications forever. The claimant did smoke 2 packs of cigarettes a day until December 2006, well after his onset date and pulmonary function studies have been normal. The claimant has not shown further problems after heart surgery and though he was noted to have angina although this problem was not noted to have recurred in later

notes.  The claimant has not complained of side effects
from his medication or that they are ineffective.  The
claimant has reported using a CPAP, which is effective,
in treating his apnea but has not reported using any
other aides such as a brace or cane.  The claimant did
engage in medium-to-heavy exertion up to his onset date
and it is not clear what prevented the claimant from work
at this point.  The claimant notes heart complaints but
these were not considered a problem until later and the
claimant likewise did not have serious back problems at
this point.  The claimant reported being sleepy all the
time but he did not indicate that this restricted his
driving or caused him difficulty.  The claimant reported
in his testimony that he could lift anything though he
reported in the evidence that he could lift 5 pounds
(Exhibit 7E).  The undersigned finds that the claimant is
able to perform an adequate range of daily activities.
Given all of the above, the undersigned finds that the
allegations of disabling pain are deemed excessive, not
fully credible, and are treated accordingly.

(Tr. at 14-15.)

In his decision, the ALJ determined that Claimant had

medically determinable impairments that could cause his alleged

symptoms.  (Tr. at 15.)  The ALJ's decision contains a thorough

consideration of Claimant's daily activities, the location,

duration, frequency, and intensity of Claimant's pain and other

symptoms, precipitating and aggravating factors, Claimant's

medications, and treatment other than medication.  (Tr. at 14-16.)

The ALJ explained his reasons for finding Claimant not entirely

credible, including objective findings, Claimant's treatment, the

lack of evidence of side effects which would impact Claimant's

ability to perform work at sedentary exertional levels, limited by

an inability to perform more than simple, easy-to-learn unskilled

work, and her abundant self-reported daily activities. Id.

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's credibility, the court finds that the ALJ properly weighed Claimant's subjective complaints of pain and his credibility in keeping with applicable regulations, case law, and Social Security Ruling ("SSR") and that his findings are supported by substantial evidence.   20 C.F.R. §404.1529(b)(2006; SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).   The ALJ found that Claimant's subjective complaints simply were not corroborated by the objective medical evidence of record.   The ALJ is required to evaluate a claimant's credibility, and the ALJ's evaluation is entitled to great weight. Social Security Ruling 95-5p.

Additional Evidence

Claimant next argues that "[n]ew, material, and additional evidence exists to justify reversal and/or remand in this case." (Pl.'s Br. at 10.)   Specifically, Claimant states that this evidence is:

1.   Parking Application for Mobility Impaired Person, dated 4-8-10, completed by the Plaintiff's treating physician, Gregory Chaney, M.D., which reflects that the Plaintiff is severely limited in his ability to walk (Attached hereto as "Exhibit A").

2.   Discharge Summary, dated 01/25/2010, from St. Mary's Medical Center which reflects the Plaintiff's recent left heart catheterization with stent placement into his circumflex artery (Attached hereto as "Exhibit B").

(Pl.'s Br. at 10.)

40

The Commissioner responds that the additional evidence does not warrant remand.  Specifically, the Commissioner states:

> Plaintiff attached a disabled parking application dated and signed by Dr. Chaney on April 8, 2010, stating that Plaintiff was severely limited in his ability to walk, and a January 25, 2010, discharge summary reflecting a cardiac procedure to his brief.  These additional documents do not prove that the ALJ's June 10, 2008, decision was not supported by substantial evidence, and do not merit remand.  In order to obtain a new evidence remand, the evidence submitted must be new and material and there must be good cause for the claimant's failure to submit the evidence during the administrative proceedings.  42 U.S.C. §405(g). * * *
>
> In addition, the additional documents are not material because they do not relate to the relevant time period and would not reasonably changed the ALJ's decision.  See Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985). The question before a reviewing court is not whether an alternative decision could have been supported, but whether the final agency decision was supported by substantial evidence.  In other words, the issue is "not whether [the claimant] is disabled, but whether the ALJ's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. If the final agency decision is supported by substantial evidence, the reviewing court must affirm even if it would have decided the case differently. Richardson, 402 U.S. at 401; Blalock, 483 F.2d at 775.  According, the additional evidence is not material and cannot be the basis of a remand.  See 20 C.F.R. §404.620(a)(2) (2007)(providing that the remedy for a claimant who thinks he meets the requirements for disability only after the period in which his application was in effect, i.e., after the ALJ's decision, is to file a new application).

(Def.'s Br. at 14-15.)

Claimant has moved this court, pursuant to the sixth sentence of 42 U.S.C. § 405(g), to remand his claim to the administrative level for consideration of new evidence.

41

In considering Claimant's motion to remand, the court notes initially that the social security regulations allow two types of remand.  Under the fourth sentence of 42 U.S.C. § 405(g), the court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence.  42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 97 (1991).  Where there is new medical evidence, the court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence.  42 U.S.C. § 405(g); Melkonyan, 501 U.S. at 97. The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute.  Melkonyan, 501 U.S. at 98.

In order to justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985).[1]  In Borders, the Fourth Circuit held that newly discovered

---

[1] Within relevant case law, there is some disagreement as to whether 42 U.S.C. § 405(g) or the opinion in Borders provides the proper test in this circuit for remand of cases involving new evidence.  This court will apply the standard set forth in Borders in accordance with the reasoning previously expressed in this district:

> The court in Wilkins v. Secretary of Dep't of Health & Human Servs., 925 F.2d 769 (4th Cir. 1991), suggested that the more stringent Borders four-part inquiry is superseded by the standard in 42 U.S.C. 405(g).  The standard in § 405(g) allows for remand where "there is new evidence which is material and . . . there is good cause for the failure to incorporate such evidence

evidence may warrant a remand to the Commissioner if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence. Id.

After a review of the "new evidence" provided by Claimant, the court finds that these two additional documents are not material because they do not relate to the relevant time period and would not reasonably have changed the ALJ's decision per the requirements of Borders. It is noted that the evidence marked "Exhibit B" is essentially the same information provided to the Appeals Council on February 9, 2010. (Tr. at 698-710.) It is further noted that per 20 C.F.R. §404.620(a)(2) (2010), the remedy for a claimant who thinks he or she meets the requirements for disability only after

into the record in a prior proceeding." However, Borders has not been expressly overruled. Further, the Supreme Court of the United States has not suggested that Borders' construction of § 405(g) is incorrect. Given the uncertainty as to the contours of the applicable test, the Court will apply the more stringent Borders inquiry.

Brock v. Secretary, Health and Human Servs., 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992) (citations omitted).

the period in which his application was in effect, i.e., after the ALJ's decision, is to file a new application.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is AFFIRMED and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: September 7, 2011

Mary E. Stanley
United States Magistrate Judge

44